UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RANDY ALANA,
              Petitioner,

v.

MICHAEL MARTEL, Warden,
              Respondent.

Case No. 18-07116 BLF (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK**

Petitioner has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2016 criminal judgment. Dkt. No. 1 ("Petition"). Respondent filed an answer on the merits. Dkt. No. 15 ("Answer"). Petitioner filed a traverse. Dkt. No. 24 ("Traverse"). For the reasons set forth below, the petition is **DENIED**.

## I. BACKGROUND

A jury convicted Petitioner of first-degree murder, second-degree robbery, the unlawful driving or taking of a vehicle, and two counts of grand theft. *See* Ans., Ex. A at 524-29; *see also* Cal. Pen. Code, §§ 187, 211, 484e(d); Cal. Veh. Code, § 10851(a). In addition, the jury found Petitioner had nine serious or violent felony priors and five prior prison terms, and imposed enhancements. *See* Cal. Pen. Code, §§ 667, 667.5, 1170.12.

On June 18, 2015, the trial court sentenced Petitioner to 75 years to life in prison for the first-degree murder conviction; a consecutive term of 31 years to life in prison for the second-degree robbery conviction; and 25 years in prison for the enhancements. *See* Ans.,

Ex. A at 532-41.  The trial court stayed sentencing on the remaining counts.  *See id*.; *see also* Cal. Pen. Code § 654.  In sum, Petitioner was sentenced to 131 years to life in prison.

On August 10, 2017, the California Court of Appeal ("state appellate court") affirmed the judgment.  *See* Ans., Ex. C; *see also People v. Alana*, No. A145501, 2017 WL 3431728 (Cal. Ct. App. Aug. 10, 2017) (unpublished).  On November 15, 2017, the California Supreme Court summarily denied a petition for review.  *See* Ans., Ex. D2.

When the last state court to adjudicate a federal constitutional claim on the merits does not provide an explanation for the denial," the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale."  *Wilson v. Sellers*, ––– U.S. ––––, 138 S.Ct. 1188, 1192 (2018).  "It should then presume that the unexplained decision adopted the same reasoning." *Id.*  Here, the California Supreme Court did not provide an explanation for its denial of the petition for review.  *See* Ans., Ex. D.  Petitioner did not argue that the California Supreme Court relied on different grounds than the state appellate court.  *See generally,* Pet.  Accordingly, this Court will "look through" the California Supreme Court's decision to the state appellate court's decision.  *See Skidmore v. Lizarraga*, No. 14-CV-04222-BLF, 2019 WL 1245150, at *7 (N.D. Cal. Mar. 18, 2019) (applying *Wilson*).

Petitioner filed the instant federal habeas petition on November 13, 2018.  *See* Dkt. No. 1 ("Petition").  The Petition does not identify Petitioner's habeas claims, but instead attaches Petitioner's brief to the Supreme Court of California as argument.  *See generally*, Pet., Ex. A ("Petition Exhibit A").

## II.  STATEMENT OF FACTS

The following background facts are from the opinion of the state appellate court on direct appeal:

### A.  Appellant's Relationship with the Victim, Sandra Coke
In 1993, Sandra Coke was a criminal defense investigator for the California Appellate Project, working on the case of death row inmate David Mason.  Coke was assigned the task of locating

and interviewing appellant about his friendship with Mason. Coke found appellant in Santa Rita Jail and obtained an affidavit from him. She subsequently told her boss that appellant was charismatic, good looking and smart. According to appellant, Coke was receptive to his advances and a romantic relationship quickly ensued.

For most of the time that appellant and Coke knew each other, appellant was either in jail or prison. Although Coke told some friends and family she was involved with a man named Randy, she did not tell them about his criminal history or that he was in prison. Appellant was the father of Coke's daughter, Jane Doe, who was born in 1998. Coke raised Jane Doe by herself, telling people that the father was out of the picture or that he lived out of state. Coke confided to one friend that Jane Doe's father was not involved in their life because he was a bad guy with a criminal history.

In June 2012, appellant completed a lengthy prison sentence and was released on parole. He moved to Oakland, lived in a motel and secured a job at Caltrans through a prison work program. Because of a prior rape conviction, appellant was required to wear a GPS ankle device and excluded from living in specified areas. In January 2013, appellant became transient, which meant he could not spend more than six hours a day at one location unless he registered for residential status.

In January 2013, Coke and her daughter were also living in Oakland. When Coke learned that appellant was out of custody, she offered her assistance and the two began spending time together. Coke continued to keep appellant's criminal history a secret, but told Jane Doe that he was her father and told friends that he had recently returned to the area. Jane Doe was not comfortable around appellant, but Coke often allowed him to spend time at their house and to keep his clothes in a spare room. Coke also provided appellant with financial support and let him borrow her car.

By spring 2013, Coke was confiding in friends about problems she was having with appellant. For example, he took her car without permission and kept it overnight. He also stole items from her home, including a camera, her daughter's headphones, and two bicycles. Coke began to create a record of appellant's misconduct. On April 26, 2013, she filed a police report that her car had been stolen, and she suspected appellant had taken it without her permission. Later that day, she reported that the car was returned. In May, Coke filed disputes with her bank about checks that appellant had forged and cashed against her account.

### B. Appellant's Arrest for Violating Parole
On May 9, 2013, appellant was arrested after Coke filed a complaint with his parole officer. Coke's written statement, which was admitted into evidence at appellant's trial, described

the following incident: On May 8, Coke reluctantly agreed that appellant could sleep in her house while she and her daughter were out for the day. Initially, Coke told appellant he could only use the garage because he was taking drugs again and pawning things to support his habit. However, appellant convinced Coke that he was not that desperate and that if she trusted him in the garage she should also trust him in the house. When Coke arrived home that evening she realized that she forgot to unlock the deadbolt, which meant appellant was locked out of the house. Then she discovered that her dog, Ginny, and two bicycles were missing. Appellant did not respond to frantic calls and texts from Coke until early the next morning, when he sent her the following text message: "Question of the day. Is a dog worth $1,000?" Coke paid appellant $1,000, but he did not return Ginny, making a "litany of excuses" as to why he could not do so.

While Coke wrote her May 9 statement, appellant's parole officer used the GPS monitor to locate appellant at an Oakland motel where he was arrested after attempting to flee. Appellant was sentenced to 150 days for parole violations and ordered to serve 75 days in custody. The day after his July 23 release, appellant attempted to falsify a drug test and spent another several days in jail.

Meanwhile, Coke's desperation to find Ginny became an obsession. Between May and August 2013, Coke visited appellant in jail at least seven times and spoke to him on the telephone at least 70 times. During conversations that were recorded by the jail, Coke pleaded with appellant to tell her what he had done with Ginny, and threatened to cooperate with the police unless he did. Appellant expressed anger and hatred toward Coke for putting him back in jail, suggesting at one point that he should blow the dog's brains out in front of her, but he also played on her sympathies and gave her false leads about how Ginny might be found.

While appellant was in jail, Coke told friends she was going to end her relationship with appellant, but she needed to stay in contact with him until she got her dog back. Dianna Oglethorpe, a work friend from the federal public defender's office, testified that when Coke talked to her about appellant in July 2013, she was always visibly upset and frightened. She knew she needed to end her relationship with appellant, but was not sure how to do it. In the summer of 2013, Coke told her good friend Wendy Springer that after appellant was released from jail, she wanted to pick him up and look for Ginny one last time and then "the relationship would be over." Springer recalled that Coke was so angry, frustrated, and sad that she no longer had any love for appellant. But, she wanted to maintain contact so that when appellant got out of jail she could pick him up and he would take her to Ginny.

During this time, appellant continued to give Coke false hope that Ginny could be found in order to dissuade her from cooperating with law enforcement. Appellant discussed this strategy with his best friend Keven Qualls during his telephone calls from jail. As appellant told Qualls, "that dog ain't to be found." Appellant also discussed the matter with a fellow inmate at the jail, Sean Zukowsky. Appellant told Zukowsky that he killed Ginny because the dog was Coke's "pride and joy." Appellant also confided that he was "playing the bitch" for money, and if Coke was not part of his "program," he would "place hands on her." Appellant also told Zukowsky that it disgusted him to even look at Coke after she sent him to jail; that an ex-wife or girlfriend had done that to him in the past; and that he would never be with a woman who called the cops on him.

Throughout the summer, appellant's parole officer made "countless" requests that Coke report the bike thefts and the theft of $1,000 to the Oakland police. Initially, Coke said she would, but by the end of the summer she was only interested in getting her dog back.

On August 1, 2013, appellant was released from custody. He was required to wear an ankle GPS monitor, and ordered not to contact Coke. But he went to Coke's house the following day, which was Coke's birthday. The day after that, Coke paid for appellant's hotel room.

**C. Coke's Disappearance and Murder**
On the morning of August 4, 2013, Coke went to church. Around 5:00 p.m. that afternoon, she had an early dinner with a man she had started dating. After she returned home, between 8:00 and 8:30 p.m. that night, Coke had two phone conversations with appellant. Then Coke told Jane Doe that she was going out with appellant to look for Ginny and would return in 20 minutes. At 10:12 p.m., Jane Doe received a call from the cell phone Coke used for work. A female stranger said she found the phone in the middle of a street in Emeryville. After several calls to her mother's personal cell phone went unanswered, Jane Doe called 911, all the while using her "Find My iPhone app" to watch the phone travel east then north toward Vacaville.

On August 5, 2013, police found Coke's phone on an off-ramp of the I–80 freeway. On August 9, they found Coke's body in a dry creek bed in Vacaville. She was wearing the same clothes she had been wearing when she left home the night of August 4, although her shoes were missing. Her cause of death was asphyxia due to strangulation.

**D. Police Investigation of Appellant's Activities**
Using data from appellant's GPS monitor, police traced appellant's steps on the evening of August 4, 2013. From 8:28 until 8:42 p.m., appellant traveled to various locations in Oakland at a speed consistent with being in a car. At 8:42 p.m.,

appellant was at a motel known as a place to buy and use drugs. He left that location around 40 minutes later, again at a speed consistent with being in a car. At 9:23 p.m., appellant's monitor stopped transmitting data, and he went "off the grid."

Investigators used Coke's bank records, surveillance video from street cameras, and witness statements to piece together some of appellant's activities on August 5, 2013. Shortly after midnight, appellant drove Coke's car to a convenience store where he used Coke's bank card to withdraw $400 from an ATM machine. Then he went to a "trap house" in Oakland where he picked up Deanna Smith. Appellant and Smith drove Coke's car to a Motel 6. At 3:12 a.m., they checked into a room where they smoked "a lot" of crack and had oral sex. At around 7:00 a.m., they drove Coke's car to a Chevron station where appellant made two failed attempts to use an ATM machine to withdraw money from Coke's bank account.

At around 9:30 a.m. on the morning of August 5, appellant parked Coke's car in the parking lot of an Oakland Housing Authority apartment complex, then walked to a stairwell where he sat down. A maintenance worker concerned by appellant's demeanor contacted dispatch, but appellant was gone by the time an officer arrived. When police searched Coke's car, they found her shoes under the brake and gas petals. Coke's purse, FasTrak transponder and ID were in the car, along with Ginny's green blanket. Coke's wallet was never found.

On the afternoon of August 5, 2013, appellant had a telephone conversation with his nephew, Angelo Gross. Appellant asked for money and a gun, telling Gross he was not going back to jail. When Gross asked about Coke, appellant said something like "Don't start acting square on me now. You know how I get down. She's probably where her dog is at." Gross contacted police and assisted them in luring appellant to a meeting location where he was arrested.

### E. Appellant's Trial Testimony
At trial, appellant denied that he killed Coke. He admitted that he stole checks from her and cashed them when he needed money. He also admitted taking or stealing the bicycles and headphones, and that he did not always return Coke's car on time when she let him borrow it. However, appellant claimed that he had permission to use Coke's debit card to get cash. Appellant also testified that he did not steal Coke's dog. According to appellant, Ginny got out when he opened the gate. Appellant claimed that he subsequently tried to find the dog and that he also attempted to return Coke's $1,000, but she refused to take it back.

Appellant testified that on the morning of August 4, 2013, he and appellant went to church together and then searched for Ginny at dog kennels and animal shelters. Appellant was aware

that Coke had a date that afternoon, claiming that he was not concerned about it because she was just trying to make him appreciate her more, and that he made her feel good by pretending he was going to show up and "punch her date in the face."

Appellant testified that he and Coke got together on the evening of August 4, 2013, because he needed to get some things from Coke's car and she wanted to help him find a place to stay that night. While they were together, Coke began to follow the car of someone who she believed had information about her dog. Eventually, they ended up at a trap house in Richmond where appellant got high while Coke was questioning people outside. When he rejoined her, Coke asked him to take her car and debit card and go get cash at an ATM while she stayed and continued to talk with people who appeared to have information about Ginny. That was the last time appellant saw Coke; when he returned with the money, Coke was gone. Appellant was not worried about her though because she was courageous and she was on "her mission." So he went back into the trap house and took more drugs, intending to "disappear" for a while, as he had done "many times" before.

*Alana*, 2017 WL 3431728 at *1–4.

## III. DISCUSSION

### A. <u>Legal Standard</u>

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id.* at 412; *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir.), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

**B.     Claims and Analyses**

Petitioner raises the following seven claims in this federal habeas petition:

(1) the trial court erred in admitting evidence regarding a murder that occurred thirty years ago;

(2) the trial court erred in admitting evidence that he assaulted his wife thirty years ago;

(3) the trial court erred in admitting evidence that he kidnapped and assaulted a prostitute who was his girlfriend twenty years ago;

(4) the trial court erred in admitting evidence of victim's hearsay statements alleging Petitioner had committed various bad acts;

(5) the trial court violated Petitioner's rights under the Confrontation Clause in admitting the victim's hearsay statements;[1]

(6) the trial court erred in failing to give limiting instructions that the victim's extrajudicial statements were admitted not for the truth of the matter but as evidence of the victim's state of mind; and

(7) cumulative error.

Because Petitioner's claims that the trial court erred in admitting Petitioner's prior bad acts (claims 1-3) turn on the same law, the Court will address those claims together, and first. The Court then will address Petitioner's claims that turn on the admission of his victim's statements (claims 4-6). Finally, the Court will address Petitioner's claim of cumulative error (claim 7) last.

**1.    Bad Acts Claims**

At the trial for the murder of Sandra Coke, the prosecution introduced evidence of three prior violent acts allegedly committed by Petitioner: the 1983 murder of Marilyn Piggott, a 1983 assault by Petitioner on Petitioner's ex-wife, and a 1993 assault by Petitioner on Petitioner's ex-girlfriend. Petitioner claims that this testimony constituted impermissible character or propensity evidence, and that its admission at trial violated his right to due process and was prejudicial. *See* Pet., Ex. A at 11-34 (stating claims 1-3).

---

[1] The Court notes that the Order to Show Cause only identified claims 1-4, 6, and 7. *See* Dkt. No. 8 (referring to Pet. at 12-13). However, a review of the record reveals that Petitioner also raised a claim based on the Confrontation Clause. *See* Pet., Ex. A at 18, 37, 39, 40. In addition, Petitioner argued in the Traverse that his rights under the Confrontation Clause had been violated. *See generally*, Tr. Although Respondent did not address Petitioner's Confrontation Clause claim in the Answer, *see generally*, Ans., the Court independently addresses that claim herein, and concludes that Petitioner's claim based on the Confrontation Clause fails.

Case No. 18-01446 BLF (PR)
ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

The facts underlying these claims, as summarized by the state appellate court, are as follows:

### F. Appellant's Prior Similar Crimes

At appellant's trial, the prosecution presented evidence of three incidents from appellant's past in which he allegedly engaged in conduct similar to the charged offenses.

The first incident was the August 13, 1983 murder of Marilyn Piggott. Joel Morgan, a childhood friend of appellant, testified that on the morning of August 13, he rented a motel room for appellant because appellant did not have identification. Appellant had a bag full of money and drugs, and over the next few days the two spent time together taking drugs and having sex with a prostitute. At one point when they were alone in the hotel room, appellant told Morgan that he murdered a woman in North Oakland because she fired him. Appellant said he had been working as a doorman or bodyguard for the women, who was a drug dealer. He also told Morgan that he stole money and drugs from the victim. Weeks later, appellant asked Morgan to give him an alibi for the time of the Piggott murder. When Morgan refused, appellant threatened him.

Piggott's best friend Rayma Smith also testified at appellant's trial in this case. Smith lived down the hall from the apartment where Piggott was found face down on her bed with a hammer in her head. Smith testified that shortly before Piggott was murdered she confided to Smith that she was afraid of appellant, but that she was also angry at him because he had stolen money from her. On the day of the murder, Smith was on her way out to the store when she saw Piggott and appellant in a heated argument. Piggott was accusing appellant of stealing and appellant was telling her to be "cool" in a threatening manner. Smith stayed around until she felt her friend was safe, but when she returned from the store several hours later another neighbor told her that Piggott was dead.

The jury heard other details about appellant's involvement in the crime including the fact that when he was arrested police found Piggott's jewelry in his car. The jury was also told that appellant was tried twice for Piggott's murder and ultimately acquitted in 1986.

The second incident involved appellant's ex-wife, Vickie R. Vickie R. testified that, at some time prior to June 25, 1983, she ended her relationship with appellant and took his house keys. On the evening of June 25, Vickie R. was lying on her sofa when she heard banging on the door and the next thing she knew appellant had broken down her door. He started punching her in the face with a closed fist, then dragged her up the stairs and tried to strangle her with his hands. She managed to get away and ran into the street where she flagged down a cab driver who

helped her contact the police. A few months later, Vickie R. arrived home early in the morning and found that her porch light had been turned off. She called the police for a security check. Officers found appellant inside the house and arrested him for Piggott's murder, which had occurred a few weeks earlier.

Finally, the jury heard about a 1993 incident involving Michelle S. Michelle S. testified that she and appellant had a dating relationship that included getting high and having sex in his motel room. One night in October, appellant asked her to go someplace with him, but she refused because she was with a friend. Appellant slapped her, chased after her when she tried to run away, and pushed her into a car driven by his friend. Appellant wanted money from Michelle S., but she did not have any. She offered to prostitute herself so she could make money for appellant. When appellant agreed, she was able to flag down someone who drove her home. Appellant was arrested for battery and kidnapping. But, after appellant spoke with Michelle S., she refused to cooperate with police and the charges were dropped.

*Alana*, 2017 WL 3431728 at *4–5.

### a. The Piggott Murder

The state appellate court rejected Petitioner's claim that admission of evidence regarding the Piggott murder violated Petitioner's due process, finding that the testimony was properly admitted under state evidence rules:

The record also demonstrates that evidence of the Piggott murder was properly admitted under to section 1101. As noted, the trial court denied the prosecutor's motion to admit this evidence under section 1109 because there was insufficient evidence that the Piggott murder involved domestic violence. But it did find evidence of a prior dating relationship between appellant and Piggott, and it concluded that this fact was one of several "points of similarity" between the two incidents. In addition, the court found that both murders were committed a short time after appellant was released from prison, when he lacked financial security and relied on the victims for money and, to some extent, for a place to stay. Furthermore, appellant stole from both victims, both victims accused appellant of stealing from him, and in both cases these accusations allegedly led to "a violent confrontation that resulted in the death." In light of these multiple similarities, the court properly exercised its discretion by concluding that evidence of the Piggott murder was "highly material and relevant on the issue of motive and intent."

In considering possible countervailing factors under section 352, the court reiterated that the Piggott murder was not too remote

because appellant had been incarcerated for most of the relevant time period. Furthermore, there was no evidence that appellant had changed in some way that would diminish the probative value of the evidence. The court also concluded that evidence of the Piggott murder was not unduly inflammatory or prejudicial, noting that the jury would not see any photographic evidence. The court acknowledged that striking someone with a hammer is a very violent act. But it reasonably concluded that the Piggott murder was not more inflammatory than the charged crime because Coke's murder by strangulation was not only violent, but extremely personal, intimate and outrageous.

Appellant argues there are two obvious dissimilarities between these murders: Piggott was murdered with a hammer, while Coke was strangled; and Piggott died in her apartment, while Coke was abandoned in a dry creek bed. The fact that appellant can draw distinctions like this does not mean that the trial court was precluded from considering and relying on the similarities outlined above. Nor do these distinctions dilute the probative value of the Piggott murder. If this evidence had been offered to prove identity or a common plan, the fact that the murder was accomplished in a different physical environment with a different weapon might be of concern. But this evidence was admitted to prove motive and it was probative of the prosecution theory that appellant killed Coke because she was no longer useful to him as a source of support. [FN 2]

> [FN 2: Appellant separately contends that the Piggott murder was "not very probative" as to the issues of motive or intent. However, appellant defeats his own subjective argument by expressly conceding that the Piggott murder was relevant to prove that appellant killed Coke because she was no longer willing to support him financially.]

Appellant argues that the trial court's section 1101 analysis was fatally flawed because the court assumed that appellant had a prior dating relationship with Piggott and that he was released from prison a short time before Piggott was murdered, but these "supposed similarities" were not established by the trial evidence. "In assessing the trial court's evidentiary ruling, we must consider the facts known to the court at the time the ruling was made. [Citations.]" (*People v. Hendrix* (2013) 214 Cal. App. 4th 216, 243; see also *People v. Hartsch* (2010) 49 Cal. 4th 472, 491.) Thus, appellant cannot establish an abuse of discretion based on alleged insufficiency of the trial evidence.

When the trial court ruled on the motion to admit evidence of the Piggott murder, appellant did not dispute the prosecutor's factual contention that appellant had been released from prison in April 1983, approximately four months before the Piggott murder. Thus, this factor was properly considered by the trial

court. Furthermore, the record demonstrates that the trial court was provided with evidence of appellant's prior dating relationship with Piggott. At the pretrial hearing, appellant's trial counsel argued that evidence of a domestic relationship between appellant and Piggott was thin. That defense attorney, who also represented appellant in the Piggott case, recalled that the prosecution theory in Piggott was that a drug dealer was killed by her employee, not by her domestic partner. In response to this argument, the court took a recess and reviewed appellant's testimony from his first murder trial in the Piggott case. Based on that review, the court concluded that there was insufficient evidence that the Piggott murder involved domestic violence, but that there was evidence that Piggott and appellant had dated in the past. These circumstances show that the trial court did not abuse its discretion by considering that appellant had a prior dating relationship with Piggott when evaluating whether to admit evidence of the Piggott murder under section 1101.

For all these reasons, appellant has failed to show that the trial court abused its discretion by admitting evidence of the Vickie R. assault and the Piggott murder under section 1101.

*Alana*, 2017 WL 3431728, at *9-10.

Habeas relief is not warranted here because no remediable federal constitutional violation occurred. First, a Petitioner's due process rights concerning the admission of propensity evidence is not clearly established for purposes of review under AEDPA, the Supreme Court having reserved this issue as an "open question." *Alberni v. McDaniel,* 458 F.3d 860, 866–67 (9th Cir. 2006); *accord Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (reaffirming *Alberni*). Second, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough,* 568 F.3d 1091, 1101 (9th Cir. 2009). Third, any claim that the state court erred in admitting the evidence under state law is not remediable on federal habeas review. The state appellate court's ruling that the evidence was properly admitted under state law binds this federal habeas court. *See Bradshaw v. Richey,* 546 U.S. 74, 76 (2005).

Moreover, even if the admission of propensity evidence was the basis for a habeas claim, it is clearly established that "[o]nly if there are *no* permissible inferences the jury

may draw from the evidence can its admission violate due process." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). Here, as the state appellate court found, the jury could have drawn the permissible inference that Petitioner was motivated to murder his victim because she was no longer of financial use to him. *See Alana*, 2017 WL 3431728, at *9 n.2 (noting that Petitioner "conced[ed]" that the Piggott murder was relevant to prove" this theory). Because the jury could have drawn this permissible inference regarding motive, the admission of evidence related to the Piggott murder did not violate Petitioner's due process.

Finally, even if the admission of evidence regarding the Piggott murder was an error of constitutional dimension – which it is not – the Court must consider whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993). In this case, it did not. As the state appellate court found, the "evidence pointing to [Petitioner's] guilt" was "overwhelming." *Alana*, 2017 WL 3431728, at *15. On August 4, 2013, shortly after 10:12 p.m., the victim's daughter was able to trace the victim's personal phone as it moved along the I-80 toward Vacaville. *See id*. The victim's body was subsequently found in Vacaville, and her personal phone was found on an off-ramp from the I-80. *See id*. The victim's shoes were missing. *See id*. After midnight, and for at least nine hours after the victim's personal phone had traveled to Vacaville, Petitioner was in possession of the victim's car and ATM card. *See id*. When the police searched the car, they found, among other things, the shoes that were missing from the victim's body. *See id*. The fact that Petitioner remained in possession of the victim's car and missing shoes well after the victim's body and personal phone had gone to Vacaville is strong circumstantial evidence that Petitioner was involved in the victim's death.

In addition, on August 5, 2013, a few hours after he had abandoned the victim's car which still held the shoes that were missing from the victim's body, Petitioner called his

nephew for assistance. *See id*. at 4. In this call, Petitioner told his nephew that the victim was "probably where her dog is at." *See id*. Petitioner had previously admitted to two persons that Petitioner killed the victim's dog. *See id*. at 3. As the victim's body was not discovered for another four days, *see id*., Petitioner's statement that the victim was in the same place as her deceased dog, a dog which he had killed, strongly suggests that Petitioner killed the victim as well.

In light of this "overwhelming" evidence of Petitioner's guilt, any error in admitting evidence of the Piggott murder did not have a "substantial and injurious effect" on the verdict. *See Dillard v. Roe*, 244 F.3d 758, 769–70 (9th Cir. 2001), *amended on denial of reh'g* (May 17, 2001) ("Even if we assume, without deciding, that the trial court [committed constitutional error], that ruling could not have had a 'substantial and injurious effect or influence in determining the jury's verdict.' . . . There was an abundance of other, uncontradicted evidence that Dillard had suffered the convictions alleged.") (citations omitted). Based on the foregoing, the state appellate court's rejection of Petitioner's first claim was reasonable and is therefore entitled to AEDPA deference. Accordingly, this claim is DENIED.

### b. Prior Acts of Domestic Violence

The state appellate court rejected Petitioner's claim that admission of his prior acts of domestic violence violated Petitioner's due process, finding that the testimony was properly admitted under state evidence rules:

> The record shows that the trial court properly exercised its discretion under section 1109. It considered the relevant factors, and reasonably concluded these two prior acts of domestic violence were more probative than prejudicial, and that the interest of justice would be served by admitting this evidence. Arguing otherwise, appellant contends the trial court failed to balance correctly the section 352 factors because his prior acts are dissimilar to the charged crimes, remote, and unduly prejudicial. We disagree with each of these contentions.
>
> First, the record shows that both prior acts involved some similarities to the present case. Vickie R. was violently attacked

and strangled by appellant after she ended their domestic relationship and locked him out of the house. Similarly, Coke was strangled to death after she locked appellant out of her home and took other steps against him that were consistent with ending their domestic relationship. Michelle S. was assaulted and kidnapped by appellant after she refused to comply with his demands. Similarly, after appellant killed Ginny to punish Coke for crossing him, Coke went somewhere in a car with him and was never seen alive again. Furthermore, appellant convinced both Michelle S. and Coke that they should not cooperate with law enforcement.

Second, the trial court explained why these prior acts of domestic violence were not remote under the circumstances of this case. Appellant was incarcerated for most of the 30–year period prior to Coke's murder, and when he was not in custody his tendency was to abuse his domestic partner. (See *People v. Daniels* (2009) 176 Cal. App. 4th 304, 317 [rape committed 15 years before charged offense not remote "because defendant had been incarcerated for the vast majority of that period"].) Appellant gives no good reason for disputing the trial court's analysis of this issue.

Third, appellant's theory of prejudice is not substantiated. He suggests that the jury may have been tempted to "condemn" him not because they believed him guilty of the charged offenses, but rather because he escaped unpunished from the prior offenses. (Citing *People v. Thompson* (1980) 27 Cal.3d 303, 314, disapproved on another ground in *People v. Scott* (2011) 52 Cal.4th 452, 470–471.) But there was overwhelming evidence that appellant was a career criminal who was incarcerated for most of the time that he knew Coke, and thus was not a person who escaped punishment. Furthermore, the Vickie R. and Michelle S. assaults were significantly less inflammatory than the charges involving Coke. Thus, it was highly unlikely that the jury would base its verdicts on a desire to punish appellant for these prior acts.

As an alternate ground for challenging the section 1109 rulings, appellant appears to contend that domestic violence propensity evidence should only be admitted in cases in which (1) the charged offenses are part of a larger scheme of escalating dominance and control over a domestic violence victim; and (2) either that victim or third party witnesses are uncooperative. As support for this argument, appellant cites *People v. Hoover* (2000) 77 Cal. App. 4th 1020, 1028, and *People v. Brown* (2000) 77 Cal. App. 4th 1324, 1333. Both cases rejected claims that section 1109 violates constitutional due process. The courts' opinions highlighted policy reasons for admitting domestic violence propensity evidence, including that such conduct often recurs and that victims often refuse to cooperate. (*People v. Hoover*, at p. 1028; *People v. Brown*, at p. 1333.) But

neither case restricts the use of section 1109 to cases in which these policies are directly implicated.

Nor is the language of section 1109 limited to cases in which a defendant has been charged with long-term domestic violence against an uncooperative victim. Rather, the statute expressly applies to any "criminal action in which the defendant is accused of an offense involving domestic violence." (§ 1109, subd. (a)(1).) Murder can be "'the ultimate form of domestic violence'" depending on the facts and circumstances of the case. (*People v. Brown* (2011) 192 Cal. App. 4th 1222, 1225.) Here, there is ample evidence that appellant and Coke were in a domestic relationship—they had a child together; they had resumed their dating relationship; Coke gave appellant financial and moral support; appellant regularly spent time at Coke's home and kept his belongings there. There is also evidence that Coke was a victim of appellant's domestic violence. Appellant does not dispute the trial court's finding that the killing of Coke's beloved dog was such an act, and this domestic abuse was inextricably tied to the murder of which appellant was convicted. Thus, the facts and circumstances of this case support the trial court's conclusion that the charged offenses involved domestic violence.

For all these reasons, we conclude that section 1109 was properly applied to admit evidence of the Vickie R. and Michelle S. assaults.

*Alana*, 2017 WL 3431728, at *7-8.

As with the admission of evidence of the Piggott murder, habeas relief is not warranted for the admission of Petitioner's prior acts of domestic violence. No remediable federal constitutional violation occurred. Again, the admission of propensity evidence is not clearly established for review under AEDPA, *see Alberni,* 458 F.3d at 866–67; the Supreme Court has not clearly ruled that the admission of overly prejudicial evidence is a due process violation sufficient to warrant habeas relief, *see Holley,* 568 F.3d at 1101; and a state court's ruling that the evidence was properly admitted under state law is binding on this court, *see Bradshaw,* 546 U.S. at 76. *See also Delira v. Runnels*, 213 F. App'x 580, 581 (9th Cir. 2006) ("The admission of [§ 1109] evidence was not contrary to, nor an unreasonable application of, clearly established federal law, as the Supreme Court has not ruled on the question whether propensity evidence violates the Due Process Clause.").

Moreover, as discussed above and as the state appellate court observed, the evidence brought against Petitioner at trial was "overwhelming"; even if the trial court had erred in admitting Petitioner's prior acts of domestic violence, these prior bad acts did not have a substantial and injurious effect upon the verdict. *See Brecht*, 507 U.S. at 631 (stating standard for determining whether constitutional error was harmless).

Based on the foregoing, the state appellate court's rejection of Petitioner's second and third claims was reasonable and is entitled to AEDPA deference. Accordingly, these claims are DENIED.

### 2. Claims Based on Victim's Statements

At the trial for the murder of Sandra Coke, the prosecution introduced, for the purpose of establishing the victim's state of mind, statements that the victim had made regarding the Petitioner's recent actions. Petitioner claims that these statements constituted inadmissible hearsay, violated Petitioner's rights under the Confrontation Clause, and that the trial court erred in failing to give a limiting instruction. *See* Pet., Ex. A at 35-43 (stating claims 4-6).

The facts underlying these claims, as summarized by the state appellate court, are as follows:

> **a. Pretrial Rulings**
> The trial court spent several court days ruling on pretrial motions. At the first hearing on December 9, 2014, the court began by addressing a motion by the prosecutor to admit evidence probative of Coke's state of mind. The proffer included dozens of statements that Coke made to a variety of people, from family to law enforcement to appellant himself. The statements fell into three general categories: expressions of Coke's feelings about appellant; statements about actions appellant had taken that precipitated those feelings; and statements regarding actions that Coke intended to take in the future. The prosecution argued some statements were admissible for their truth, pursuant to the hearsay exception set forth in section 1250, and others were admissible as nonhearsay circumstantial evidence of Coke's state of mind.
>
> At the December 9 hearing, appellant's trial counsel began by arguing that all of this evidence was inadmissible because Coke's state of mind was not relevant. After the court rejected

this general objection, defense counsel stated: "So if the Court is going to admit any of this, I think there ought—there has to be some understanding of what's being offered for the truth of the matter stated and what's being offered as an exception to the hearsay rule." The court agreed. Then defense counsel asked: "And assuming we hear any of that testimony, would you be giving that Instruction to the jury at the time that it's being offered? I would ask that you do that." The court responded that it thought it would have to do that and then asked the prosecutor to prepare supplemental briefing to help clarify which statements were being offered for a limited purpose.

The court opined that it would probably face a hearsay issue in any event before state of mind evidence was offered, but that it would also give a limiting instruction "throughout the trial" if it admitted state of mind evidence that was not being offered for its truth. However, the court noted there was an initial problem because it appeared that there was a lot of "overlap" in the sense that many statements were offered under more than one theory. The prosecutor concurred and then proceeded to argue that an instruction limiting the use of evidence of appellant's (uncharged) theft-related conduct during 2013 to a consideration of Coke's state of mind would not be appropriate if the evidence was also admissible under section 1101. After further discussion, the court elected to continue the matter without making any ruling, stating at one point that "I've been sitting up here for 30 years, and I don't think I've ever been more confused than I am now."

More than a week later, on December 17, the court returned to the motion to admit Coke's statements as evidence of her state of mind. At that point, the court had just granted a motion to admit evidence of appellant's uncharged thefts under section 1101 as relevant to prove his intent to commit theft on August 4, 2013, and to rebut the defense that Coke gave appellant permission to use her car and to take money from her bank account on the day of the murder. The court ruled that appellant's taking of the car and headphones, and the forged checks were all admissible under section 1101. The court found that the bike thefts were intertwined with the disappearance of the dog and the extortion of $1,000, evidence which had already been ruled admissible under other provisions of the Evidence Code. The court observed that some of the uncharged theft evidence was also included in the in limine motion to admit state of mind evidence, which the court considered next.

Appellant began by renewing his objection that Coke's state of mind was not relevant at all. In response, the prosecutor outlined two theories of relevancy. First, Coke's mental state was relevant to support the prosecution theory that appellant killed Coke because she broke up with him on August 4, 2013. In other words, evidence that Coke intended to terminate her relationship with appellant because of the way he behaved in the spring of

2013 made it more likely that she acted in conformity with that intent, which gave appellant a motive to kill her. Second, evidence that Coke previously accused appellant of stealing her car and money was relevant to show that she did not give appellant her consent to take her car or debit card that night.

The trial court made a formal ruling that Coke's state of mind was relevant to support the theories outlined by the prosecution, and then proceeded to make separate admissibility rulings as to each statement the prosecutor sought to introduce, admitting many, but excluding others under section 352.

For example, the prosecutor sought to introduce evidence of a conversation between Coke and her friend Michelle Remy during which Coke made direct statements about her fearful feelings toward appellant, and also described threats appellant made that made her fear him. The prosecutor argued that Coke's statement that she was afraid of appellant was admissible hearsay under section 1250, and the rest of the conversation was circumstantial evidence of Coke's state of mind. The court responded that it would be too confusing for the jury to follow a special instruction telling them to consider only part of the conversation for its truth. When the prosecutor suggested that a limiting instruction might not be necessary, the court opined that it seemed likely the defense was "going to want" an instruction about what evidence the jury could consider for its truth and what statements could not be considered for their truth. Thus, the court ruled that the prosecutor should limit questions about this conversation to Coke's statement that she was afraid of appellant.

Defense counsel did not actively participate in the discussion regarding Coke's conversation with Remy, which we have just described. Nor did he request that any particular statement of Coke's that was ruled admissible be accompanied by a limiting instruction. Indeed, during the December 17 hearing, appellant's trial counsel never even alluded to the issue of whether the court should give a limiting instruction for circumstantial state of mind evidence.

**b. Limiting Instructions During Trial**
On March 17 and 18, 2015, the prosecutor made her opening statement to the jury. After that presentation, the court talked to the jury about the fact that the prosecutor had referenced several uncharged acts by appellant that were going to be discussed at trial, and it gave instructions regarding the limitations attendant to evidence that was going to be admitted under section 1101 and/or section 1109. Then, defense counsel made his opening statement.

The defense theory was that appellant's guilt could not be established beyond a reasonable doubt because the People's evidence was circumstantial and did not establish that appellant

had a motive for the crimes. Defense counsel emphasized that appellant had never been violent against Coke, and claimed there was no reason why on August 4, appellant would decide to become violent against a woman he loved and who was going to continue to take care of him. Defense counsel urged the jury to take "with a grain of salt," evidence that Coke allegedly wanted to break off the relationship or was afraid of appellant.

On the afternoon of March 18, the prosecutor elicited testimony from Coke's friend, Wendy Springer. Springer testified that Coke told her that appellant took her car without permission and also stole her bicycles, Jane Doe's headphones, and a camera. Springer gave more detailed testimony about the circumstances surrounding Ginny's disappearance, including the fact that she loaned Coke money so that Coke could pay appellant's demand for $1,000. The defense did not request a limiting instruction with respect to any of this testimony.

A short time later, the prosecutor asked Springer to authenticate Coke's handwriting on the May 9, 2013 statement that Coke wrote for appellant's parole officer. Defense counsel referenced a prior objection but did not repeat it in front of the jury. Then, without waiving that prior objection, the defense stipulated that Springer could read Coke's statement to the jury. After Springer read part of the statement, the court interrupted and held sidebar conference with counsel. Then the court instructed the jury regarding the definition of hearsay, the hearsay rule, and the section 1252 exception to the hearsay rule for evidence offered to prove a declarant's state of mind or to explain acts or conduct of the declarant. The court then stated that Coke's statement was being offered pursuant to the state of mind exception to the hearsay rule and also to explain her conduct.

As our factual summary reflects, several other witnesses testified about conversations they had with Coke about appellant. In addition, the prosecutor was permitted to introduce evidence of a letter Coke wrote to appellant in which she discussed things appellant had done that caused her emotional or psychological harm. As best we can determine, the jury did not receive any limiting instruction regarding its consideration of this evidence.

*Alana*, 2017 WL 3431728, at *11–13.

Although the challenged statements were not identified in the state appellate court's opinion, the statements are summarized in Petitioner's brief to the California Supreme Court, which was attached as argument to the Petition. *See* Pet., Ex. A at 6. Petitioner specifically challenges the admission of the following statements:

> [T]he jury heard the following damaging statements by Coke about appellant. Coke told Michelle Remy that appellant took her car. . . . Coke told Officer Bryan Glick that appellant took her car without her permission. . . . Coke told Remy that she sometime[s] feared appellant, and that appellant had threatened to break into her house and "do awful things" if Coke were to turn him away. . . . Coke told Wendy Springer, Tanya Kendall, and Remy that appellant admitted to stealing her dog Ginny, two bicycles, a camera, and headphones from Coke's residence. . . . Coke told Remy that she was scared of what appellant might do, and she feared he may have harmed her dog Ginny. . . . Coke wrote a statement for appellant's parole agent, Nghia Tran, which accused appellant of stealing her dog and her bicycles and extorting $1,000 for her stolen dog's return. . . . Coke told Diane Oglethrope that appellant stole her dog and asked for ransom, that she was upset with him, and that she was trying to end the relationship. . . . Coke told appellant's nephews Angelo Gross and Carlton Duncan that appellant stole her dog and extorted $1,000 from her. . . . Coke wrote a letter to appellant, accusing him of stealing her dog and headphones and extorting $1,000 from her.

Pet., Ex. A at 36 (record citations omitted).

### a. Due Process Argument

Petitioner's first challenge to the admission of the victim's statements is that those statements were hearsay, and their admission in contravention of evidence rules violated his due process. The state appellate court rejected this claim, finding that the statements were properly admitted under state evidence rules:

> Appellant first contends that statements Coke made about the things appellant did in the spring of 2013 were inadmissible hearsay because they were not relevant to any disputed issue at trial. We disagree. First, these statements were circumstantial evidence that Coke intended to break up with appellant in August 2013; the acts appellant committed in the spring of 2013 helped explain why Coke wanted to break up with him. Second, statements that Coke made about appellant's theft-related activity were relevant to prove that Coke did not consent to appellant using her car or debit card on the day she was murdered. Evidence of these feelings that Coke had about appellant, including her fear of him and intent to break up with him because of his behavior toward her, were relevant because they gave appellant a motive for the charged murder and robbery.
>
> "Although motive is normally not an element of any crime that the prosecutor must prove, 'evidence of motive makes the crime

understandable and renders the inferences regarding defendant's intent more reasonable.' [Citation.]" (*People v. Riccardi* (2012) 54 Cal. 4th 758, 815 (*Riccardi* ), disapproved on another ground in *People v. Rangel* (2016) 62 Cal. 4th 1192, 1216.) Unquestionably, motive was a disputed issue in this case. Indeed, according to his opening statement at trial, appellant's primary defense was that he did not have a motive for the charged crimes. Defense counsel told the jury that Coke was the best thing that happened to appellant in his adult life, she was his "bread and meat," she provided him with financial and emotional support, and there was no reason he would kill her.

In *Riccardi, supra*, 54 Cal. 4th 758, the Supreme Court held that evidence of a murder victim's statements that she was afraid of the defendant and that she acted in conformity with that fear by breaking up with him was relevant to the issue of motive when other evidence established that the defendant was aware of the victim's state of mind and may have been motivated by it. (*Id.* at p. 821.) The same reasoning applies here. The statements that Coke made to family, friends and law enforcement tended to show that Coke was not going to continue to support appellant in the fashion to which he had become accustomed and came to expect from her. Other evidence showed that appellant was aware of Coke's change of heart. Indeed, he went to jail because Coke filed a report with his parole officer. This material change in appellant's relationship with Coke gave him a motive for the charged crimes. Appellant himself articulated that motive while he was still in jail when he told Sean Zukowsky that he would put hands on Coke if she withdrew her financial support.

Appellant contends that Coke's statements about his "bad acts" may have been probative of her state of mind at the time he committed those acts, but they were not probative of her state of mind several months later around the time of her murder, which was the only time when her state of mind could have been relevant. We disagree for two separate reasons. First, appellant went to jail a few weeks after he committed these acts and was not released until a few days before Coke was murdered. This fact effectively precludes appellant from using the mere passage of time to create distance between this uncharged conduct and the charged crimes. Second, appellant's assumption that each of the "bad acts" that he committed in the spring of 2013 had an isolated temporary effect on Coke is flawed. The category of statements that appellant challenges on appeal was relevant, along with the other state of mind evidence, to prove the prosecution theory that Coke decided to terminate her relationship with appellant due to his multiple and increasingly dangerous transgressions during the relatively short period that she allowed him to participate in her domestic life.

According to appellant, the trial record conclusively shows that he and Coke were not estranged at that time of the murder, pointing to evidence that after appellant was released from jail,

they continued to spend time together and Coke continued to provide him with moral and financial support. Thus, appellant posits, the "prosecution theory that Coke ended her relationship with appellant around the time of her death was speculative." Appellant's opinion about what the evidence did nor did not show was a jury argument. It does not alter our conclusion that the trial court properly exercised its discretion by admitting the challenged statements as circumstantial evidence of Coke's intention to terminate her relationship with appellant, which gave appellant a motive for the charged robbery and murder.

*Alana*, 2017 WL 3431728, at *13-14.

The state appellate court's ruling that the evidence was properly admitted under state law binds this federal habeas court. *See Bradshaw,* 546 U.S. at 76. Moreover, there was clearly a permissible inference to be drawn from the victim's statements. *See Jammal*, 926 F.2d at 920 ("Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process."). As the state appellate court explained, a key argument in Petitioner's defense was that he had no motive to kill the victim. By introducing the victim's statements, the prosecution was able to show that the victim intended to terminate her relationship with Petitioner, and that this termination gave Petitioner a motive to kill her. In other words, the prosecution used the victim's statements to rebut Petitioner's motive argument.

Even if the admission of the victim's statements to prove motive were problematic, any error was harmless because admissible evidence aside from the victim's statements provided a motive for that murder. The victim's complaint to Petitioner's parole officer was separately admitted into evidence, and Petitioner was arrested based on that complaint. *See Alana*, 2017 WL 3431728, at *2. Petitioner subsequently told his best friend that he would physically harm the victim for having him sent to jail. *See id*. at 3. Even without the victim's statements, the jury heard evidence that Petitioner had a motive to murder the victim. This Court therefore cannot say, even if the trial court erred in admitting the victim's statements (which it did not), that such an error had a substantial and injurious effect on the verdict. *See Brecht*, 507 U.S. 619 (setting forth the standard); *see*

*also Dillard*, 244 F.3d at 770 (holding there was no "substantial and injurious effect" by admitting evidence, when it was duplicated by "an abundance of other, uncontradicted evidence").  Moreover, as explained above, the evidence against Petitioner was "overwhelming."  *See Alana*, 2017 WL 3431728, at *15 ("[W]e conclude that given the overwhelming nature of the evidence pointing to appellant's guilt, and other unobjectionable evidence of Coke's state of mind and appellant's motive presented from other witnesses, any failure to give limiting instructions relative to this evidence was harmless.").  Because there was cumulative evidence that Petitioner had a motive to kill the victim, and the evidence against Petitioner was overwhelming, any error in admitting the victim's statements was harmless.

Accordingly, the state appellate court reasonably rejected Petitioner's fourth claim, and its determination is entitled to AEDPA deference.  Petitioner's fourth claim is DENIED.

### b.  Confrontation Clause Argument

Petitioner's second challenge to the admission of the victim's statements is that the admission of those statements violated his Sixth Amendment right to confront his accusers.  Although the state appellate court appears to have acknowledged that Petitioner raised this argument in direct appeal, *see Alana*, 2017 WL 3431728, at *10, it did not analyze Petitioner's confrontation argument separately from his due process argument, *see id*. at *10-15.  Nevertheless, for the reasons stated below, the Court finds that Petitioner's Sixth Amendment right to confrontation was not violated.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI.  The federal confrontation right applies to the states through the Fourteenth Amendment.  *Pointer v. Texas*, 380 U.S. 400, 403 (1965).  The goal of the Confrontation Clause is to ensure reliability of evidence, though it is a procedural rather than a

substantive guarantee. *See Crawford v. Washington*, 541 U.S. 36, 61 (2004). It commands not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. *Id.*; *see Davis v. Alaska*, 415 U.S. 308, 315–16 (1974) (noting a primary interest secured by the Confrontation Clause is the right of cross-examination). The Clause thus reflects a judgment, not only about the desirability of reliable evidence, but about how reliability can best be determined. *Crawford*, 541 U.S. at 61; *see, e.g.*, *United States v. Medjuck*, 156 F.3d 916, 919 n.1 (9th Cir. 1998) (noting that the Confrontation Clause serves to ensure that witnesses will testify under oath, to force witnesses to undergo cross-examination, and to permit the jury to observe the demeanor of witnesses).

The Confrontation Clause applies to all out-of-court testimonial statements offered for the truth of the matter asserted, i.e., "testimonial hearsay." *See Crawford*, 541 U.S. at 51. Out-of-court statements by absent witnesses that are testimonial hearsay are barred under the Confrontation Clause unless (1) the witnesses are unavailable at trial, and (2) the defendants had a prior opportunity to cross-examine the witnesses. *Id.* at 59. If, however, a hearsay statement is not testimonial in nature, then that statement "is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006). Here, Respondent appears to concede that at least some of the victim's statements were hearsay. *See* Ans. at 16 (arguing that the statements fell into a hearsay exception, not that the statements were not hearsay); *see also Alana*, 2017 WL 3431728, at *12 ("The prosecutor argued that Coke's statement that she was afraid of appellant was admissible hearsay under section 1250 . . . ."). Similarly, the state appellate court characterized the victim's statements as hearsay. *See Alana*, 2017 WL 3431728, at *11 ("Evidence that is admitted under section 1250 is hearsay."). Accordingly, the Court must determine whether the victim's statements were testimonial in nature in order to determine whether the Confrontation Clause applies.

The "primary purpose" test establishes whether a statement is testimonial. *Ohio v. Clark*, 135 S. Ct. 2173, 2179 (2015). Under this test, statements are testimonial: (1) "when they result from questioning, 'the primary purpose of [which was] to establish or prove past events potentially relevant to later criminal prosecution,'" and (2) "when written statements are 'functionally identical to live, in-court testimony,' 'made for the purpose of establishing or proving some fact' at trial." *Lucero v. Holland*, 902 F.3d 979, 989 (9th Cir. 2018) *cert. denied,* 139 S. Ct. 1180 (2019) (citations omitted). When the primary purpose of taking an out-of-court statement is to create an out-of-court substitute for trial testimony, the statement is testimonial hearsay and *Crawford* applies. *See Michigan v. Bryant*, 562 U.S. 344, 358 (2011) (explaining the primary purpose inquiry). When that was not the primary purpose, "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.*

"The 'primary purpose' of a statement is determined objectively." *United States v. Rojas-Pedroza*, 716 F.3d 1253, 1267 (9th Cir. 2013). Thus "'the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.'" *Id.* (quoting *Bryant*, 562 U.S. at 360). The testimonial intent of the speaker must be evaluated in context, and part of that context is the questioner's identity. *Lucero*, 902 F.3d at 990 n.5.

If the Confrontation Clause applies to a given statement, Confrontation Clause claims are still subject to harmless error analysis. *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004); *see also United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005). For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the statement had an actual and prejudicial effect upon

the jury. *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht*, 507 U.S. at 637).

The statements that Petitioner challenges, identified above, may be grouped into statements to friends, statements to Petitioner, statements to Petitioner's family, and statements to law enforcement. *See* Pet., Ex. A at 36. First the Court will analyze whether the victim's statements to friends, Petitioner, and Petitioner's family, (collectively, "personal conversations") were testimonial in nature and, if so, whether their admission had an actual and prejudicial effect upon the jury. Next the Court will apply the same inquiry to the victim's statements to law enforcement.

### i. Personal Conversations

The Court first examines the statements the victim made to friends, Petitioner, and Petitioner's family during personal conversations.

The victim told her friends Michelle Remy, Wendy Springer, Tanya Kendall, and Dianna Oglethorpe that Petitioner took the victim's car, stole and ransomed her dog, and stole several items of the victim's property. *See id.* (citing Ans., Ex. B at 491-92, 604, 891-93, 902). The victim also told her friends that she was trying to end her relationship with Petitioner, that Petitioner had threatened "do awful things" to her if she refused to "let him be with her and have access to her home," that she was afraid of Petitioner, and that she was afraid Petitioner may have harmed her dog. *See id.* (citing Ans., Ex. B at 895-96, 943-44, 2169-72). Similarly, the victim told Petitioner's nephews that Petitioner had stolen the victim's dog and extorted $1,000 for the return of the dog. *See id.* (citing Ans., Ex. B at 1263, 1266, 1270, 1462-63). The victim made the same statement to Petitioner in a letter; the same letter also refers to Petitioner's theft of the victim's car. *See id.* (citing Ans., Ex. B at 638-40); *see also* Ans., Ex. B at 638:26-639:9.

All of the above statements were non-testimonial, and therefore not subject to the Confrontation Clause. First, the statements were non-testimonial as a matter of law

because they were not made to law enforcement personnel, or to persons the victim believed were working with law enforcement. "No Supreme Court authority has held that statements made to someone other than law enforcement personnel are testimonial." *Schubert v. Warner*, 605 F. App'x 688 (9th Cir. 2015) (finding that statements to a family friend were non-testimonial). *See also Saechao v. Oregon*, 249 F. App'x 678, 679 (9th Cir. 2007) (a conversation "between two friends, without any active participation by a government official" was non-testimonial); *cf. Bryant*, 562 U.S. at 359 n.3 ("*Davis* explicitly reserved the question 'whether and when statements made to someone other than law enforcement personnel are "testimonial."'" *Ibid.* We have no need to decide that question in this case either because Covington's statements were made to police officers."). The friends to whom the victim made her statements were a kindergarten teacher, *see* Ans., Ex. B at 479:7 (Wendy Springer); a physical education teacher, *see id*. at 883:9 (Michelle Remy); a college professor, see id. at 582:24-25 (Tanya Kendall); and a paralegal for the federal public defender in another county, *see id*. at 2166:2-11 (Dianna Oglethorpe). Petitioner's nephews were a CalTrans employee, *see id. at* 1246:4 (Angelo Gross), and an AT&T employee, *see id*. at 1454:9 (Carlton Duncan). None of these friends or family members worked for or with law enforcement. Nor can the victim have expected Petitioner to pass her letter to law enforcement. *See id*. at 638-40 (letter from victim to Petitioner). Because the victim did not make any of these statements to law enforcement, the victim could not have had testimonial intent in making the challenged statements. *See Crawford,* 541 U.S. at 51 (describing "statements made unwittingly to an FBI informant" as non-testimonial, because of the declarant's ignorance of the witness's role).

Second, the circumstances surrounding each of the challenged statements show that the statements were non-testimonial. The United States Supreme Court has explained that "[s]tatements to friends and neighbors about abuse and intimidation" are not testimonial.

*Giles v. California*, 554 U.S. 353, 376 (2008); *see also. Bryant*, 562 U.S. at 381 ("For an out-of-court statement to qualify as testimonial, the declarant must intend the statement to be a solemn declaration rather than an unconsidered or offhand remark; and he must make the statement with the understanding that it may be used to invoke the coercive machinery of the State against the accused. . . . That is what distinguishes a narrative told to a friend over dinner from a statement to the police.") (Scalia, J., dissenting); *United States v. Palamarchuk*, 791 F. App'x 658, 662 (9th Cir. 2019) ("a conversation between friends over dinner" is non-testimonial); *Lara v. Allison*, 617 F. App'x 769, 770 (9th Cir. 2015) ("statements [made] during an unprompted, informal conversation between coworkers at their place of employment" are non-testimonial); *Williams v. Adams*, 447 F. App'x 829, 831 (9th Cir. 2011) (statements made to family members are non-testimonial). There is no suggestion in the record that the victim believed her statements to friends, Petitioner, and Petitioner's family would be "used to invoke the coercive machinery of the State." *Bryant*, 562 U.S. at 381. Instead, "reasonable participants" in the conversations at issue would have construed the purpose of those conversations as requesting help or emotional support. *See id*. at 360 (emphasizing that the court must ask what "purpose [] reasonable participants would have had"). For example, in the conversation where the victim told Wendy Springer that the Petitioner had stolen and was ransoming the victim's dog, the victim had called Ms. Springer to ask for assistance in meeting Petitioner's monetary demand. *See* Ans., Ex. B at 491:3-13. In the conversation where the victim told Dianna Oglethorpe that the victim "was worried about breaking [the relationship with the Petitioner] off," the victim sought emotional support and advice from a friend; Ms. Oglethorpe described the victim as "visibly upset" and "crying," and stated that the victim "didn't know what to do." *Id*. at 2172:6-13. The victim called Petitioner's nephew Carlton Duncan to seek help in finding her dog; that nephew explained that the victim was "just trying to get some information," because she thought Petitioner "may have the dog."

United States District Court
Northern District of California

*Id.* at 1461:35-36, 1462:16, 1463:4-5. Petitioner's other nephew, Angelo Gross, explained that when the victim told him that Petitioner had stolen the victim's dog, extorted money from her, and that she was trying to end her relationship with the Petitioner, this was one of "quite a few" calls from "an aunt figure." *Id.* at 1270:27, 1271:28; *see also id.* at 1266-73 (describing conversations with his "aunt figure"). For each statement the victim made in personal conversations, the circumstances make clear that the victim was speaking with friends and family in an ordinary fashion, not attempting to create a record with law enforcement.

Accordingly, the victim's statements to friends, the Petitioner, and Petitioner's family were not testimonial in nature. Because these statements were not testimonial, the Confrontation Clause does not apply, and the Court need not ask whether their admission had an actual and prejudicial effect upon the jury.

### ii.    Statements to Law Enforcement

The Court now examines the statements the victim made to persons in or affiliated with law enforcement. Petitioner challenged the following statements made to persons in or affiliated with law enforcement:

> Coke told Officer Bryan Glick that appellant took her car without her permission. . . . Coke wrote a statement for appellant's parole agent, Nghia Tran, which accused appellant of stealing her dog and her bicycles and extorting $1,000 for her stolen dog's return.

Pet., Ex. A at 36 (citing Ans., Ex. B at 495, 497-501, 838-40, 853-54.)

### a.  Officer Glick

As to the statements to Officer Glick, a review of the record reveals that those statements were not testimonial. The statements were made when Officer Glick met with the victim to create a stolen vehicle report, in order to recover the victim's stolen car. *See* Ans., Ex. B at 837:11-16. Statements made to obtain police assistance are not testimonial. *See Davis*, 547 U.S. 813 at 826-27 (finding that a 911 call was not testimonial, because it

United States District Court
Northern District of California

"is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance."); *Leavitt v. Arave*, 383 F.3d 809, 830 n.22 (9th Cir. 2004) (statements to police were non-testimonial when the victim "initiated their interaction," was not being interrogated, and "sought [police] help in ending a frightening intrusion into her home"); *Arias v. Muniz*, No. C 15-1136 WHA (PR), 2016 WL 1427497, at *5 (N.D. Cal. Apr. 12, 2016) (holding that statements made "to address an ongoing emergency" are not "converted into testimonial statements under *Crawford* because a police officer . . . memorializes them in a report").

In response to the victim's call for assistance, Officer Glick was dispatched to the victim's house at 3:00 a.m., and arrived at the victim's house at 3:37 a.m. *See* Ans., Ex. B at 837:11-15, 838:6-7. The time of the victim's conversation with Officer Glick suggests that both parties viewed the situation as an ongoing emergency, rather than an interrogation. The victim described the car and the circumstances under which she had last seen it, *see id*. at 838:13-839:9, suggesting that she expected Officer Glick to recover the car. Officer Glick relayed the report "to [] Dispatch so it could be entered into [the] stolen vehicle system, and [] broadcast a description of the vehicle." *Id*. at 841:8-10. Considering the time at which the report was taken, the information relayed to Officer Glick, and the use to which Officer Glick immediately put this information, the Court concludes that the victim's primary purpose in making these statements was to recover her stolen car. Because the victim's "statement[s] [were] not procured with a primary purpose of creating an out-of-court substitute for trial testimony . . . the admissibility of [the] statement[s] is the concern of state and federal rules of evidence, not the Confrontation Clause." *Bryant*, 562 U.S. at 358–59.

For the sake of being thorough, the Court notes that, even if the victim's statements to Officer Glick were considered testimonial – which they are not – any error in admitting those statements would be harmless. In assessing a Confrontation Clause violation, courts

consider, *inter alia*, "whether the testimony was cumulative." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). As noted above, the jury heard several non-testimonial statements from the victim to the victim's friends, that established Petitioner had stolen the victim's car. The victim's daughter also informed the jury that Petitioner had stolen the victim's car, *see* Ans., Ex. B at 669:7-10, and the victim referenced Petitioner's theft of the car in a letter from the victim to Petitioner, *see id*. at 638:26-639:9. Petitioner also testified about this incident, admitting that he did not have permission to take the car, and stating that the victim had filed a police report accusing Petitioner of stealing the car. *See id*. at 2819:21-2820:6. When this cumulative testimony is considered, the Court cannot conclude that the admission of the victim's statements to Officer Glick had a substantial and injurious effect on the verdict.

### b. Agent Tran

As to the statements to Agent Tran, a review of the record suggests that those statements *may* have been testimonial in nature. On the one hand, Agent Tran testified that the victim contacted him so that he would "ask [Petitioner] to get [the victim's] dog back." Ans., Ex. B at 2278. Because the victim sought Agent Tran's help to recover her dog, the trial court could have reasonably concluded that the victim's statements to Agent Tran were made "to describe current circumstances requiring police assistance." *Davis*, 547 U.S. 813 at 827 (finding that statements made with this primary purpose are not testimonial). The inference that the victim was seeking Agent Tran's help, rather than attempting to testify against Petitioner, is bolstered by her refusal to file a police report about Petitioner's crimes against her. *See* Ans., Ex. B at 2284:22-2285:5 (stating that Agent Tran repeatedly asked Petitioner to file a police report, but that Petitioner refused because "she was only interested in getting her dog back"); *see also id*. at 2298:8-2299:12 (stating, in response to defense counsel's questioning, that the victim only wanted her dog back).

On the other hand, the record reveals that the victim's statements to Agent Tran were immediately used to charge Petitioner with a parole violation. *See id.* at 2280:13-2281:5. In fact, Agent Tran left his office while the victim was still completing her statement, to find and arrest Petitioner for a parole violation. *See id.* at 2270:20-26. The victim thus understood that her statement would be used to revoke Petitioner's parole. There is no suggestion in the record that the victim expected Agent Tran to help recover the victim's stolen dog. In an abundance of caution, the Court will presume for the purposes of this petition that the victim's statements to Agent Tran were testimonial. Because the Court presumes that the victim's statements to Agent Tran were testimonial, the Court proceeds to the next step in the Confrontation Clause inquiry: whether any error in admitting the victim's statements was harmless.

Here, even if the victim's statements to Agent Tran are deemed testimonial, their admission against Petitioner was harmless considering other, cumulative evidence. *See Van Arsdall*, 475 U.S. at 684 (stating courts must consider "whether the testimony was cumulative" in evaluating a potential Confrontation Clause violation). Petitioner challenges the victim's statement that to Agent Tran Petitioner stole the victim's dog, extorted $1,000 from the victim for the return of the dog, and stole the victim's bicycles. *See* Pet. at 35 (citing Ans., Ex. B at 495, 497-501. However, the jury heard all of this information from other sources: the victim told her friends that Petitioner stole and ransomed her dog, and stole several items of the victim's property including two bicycles, *see* Ans., Ex. B at 491-92, 604, 891-93, 902; the victim told Petitioner's nephews that Petitioner had stolen the victim's dog and extorted $1,000 for the return of the dog, *see id.* at 1263, 1266, 1270, 1462-63; and the victim referenced these wrongs in a letter written to Petitioner, *see id.* at 638-40. When this cumulative testimony is considered, the Court cannot conclude that the admission of the victim's statements to Agent Tran had a substantial and injurious effect on the verdict.

Because the victim's challenged statements were largely non-testimonial, and the sole statement that was testimonial was duplicated by non-testimonial statements, Petitioner is not entitled to relief on his Confrontation Clause claim. Accordingly, Petitioner's fifth claim is DENIED.

### c. Jury Instruction Argument

Petitioner's third challenge to the admission of the victim's statements is that the trial court erred in failing to give a limiting instruction, informing the jury that the victim's statements were admitted not for the truth of the matter but as evidence of the victim's state of mind.

The state appellate court rejected this claim, finding that some of the victim's statements did not require a limiting instruction, and that as to the statements that may have required such an instruction, Petitioner's counsel failed to request the instruction:

> Appellant's second claim of error with respect to Coke's state of mind evidence pertains to the fact that the trial court gave a limiting instruction only one time, when it admitted evidence of the May 9, 2013 statement Coke gave to appellant's parole agent. Appellant contends that, as a result of the "court's instructional omissions," the jury improperly considered Coke's statements as proof that appellant stole her car, bicycles, headphones, and dog, extorted $1,000 from her, and threatened and scared her.
>
> When a direct declaration of a person's state of mind is admitted for its truth under section 1250, it is not subject to any limiting instruction. (*Riccardi, supra*, 54 Cal. 4th at p. 822; *Ortiz, supra,* 38 Cal. App. 4th at p. 389.) Thus, appellant's claim of instructional error fails to the extent he is contending that he was entitled to a limiting instruction regarding statements Coke made about how she felt about appellant, or what she intended to do.
>
> Different considerations apply, however, to statements that constitute circumstantial evidence of the declarant's state of mind. "This nonhearsay category of statements presents an elevated danger of prejudice if the jury is unable to distinguish between the truth of the matter asserted and the inferences concerning the declarant's state of mind. [Citation.]" (*Riccardi, supra*, 54 Cal. 4th at p. 823.) In such situations, a limiting instruction can clarify the limited purpose for which the evidence is being admitted. However, a limiting instruction is

not always required and, indeed, there may be times when "the risk of such an instruction highlighting the defendant's conduct outweighs any benefit the instruction may provide." (*Id.* at p. 825.)

Thus, absent a request by the defense, the trial court is not required to give a limiting instruction when admitting statements as nonhearsay circumstantial evidence of the declarant's state of mind. (*Riccardi, supra*, 54 Cal. 4th at p. 823.) Rather, such evidence is subject to the general rule set forth in section 355, which states: "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Italics added.)

In the present case, appellant fails to establish that his trial counsel requested a limiting instruction *at the time* that any statement by Coke was admitted into evidence. As our background summary reflects, during the pretrial hearings, appellant's defense counsel contemplated that such a limiting instruction would be appropriate with respect to circumstantial state of mind evidence, and the trial court agreed. However, by the time such evidence was elicited at trial, defense counsel could have concluded that a limiting instruction would not be useful for a variety of reasons. For example, once the jury became aware of appellant's misconduct during the spring of 2013, defense counsel could reasonably have concluded that requesting a limiting instruction would draw further attention to the evidence. Such a limiting instruction might also highlight the fact that other direct evidence of Coke's state of mind was admitted for its truth. In any event, absent a specific request at the time the evidence was admitted, the trial court did not have an obligation to give the jury a limiting instruction regarding the proper use of circumstantial evidence of Coke's state of mind. (*Riccardi, supra*, 54 Cal. 4th at p. 823.)

Finally, we note that even if the court's limiting instructions were deficient, where the omission of a cautionary instruction is at issue, reversal of the judgment will not be required unless "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal. 2d 818, 836; *People v. Hernandez* (2004) 33 Cal. 4th 1040, 1054.) In this case, we conclude that given the overwhelming nature of the evidence pointing to appellant's guilt, and other unobjectionable evidence of Coke's state of mind and appellant's motive presented from other witnesses, any failure to give limiting instructions relative to this evidence was harmless.

*Alana*, 2017 WL 3431728, at *14–15.

1    First, the state appellate court's ruling regarding the necessity of jury instructions

2    under state law binds this federal habeas court. *See Bradshaw,* 546 U.S. at 76.

3        Second, as the state appellate court noted, the trial court did give a limiting

4    instruction when it admitted the victim's statements to Agent Tran. *See Alana*, 2017 WL

5    3431728, at *14. In fact, the trial court gave a limiting instruction when admitting those

6    statements and repeated the limiting instruction when it gave final jury instructions post-

7    trial. *See* Ans., Ex. B at 501:23-502:20, 3268:25-3269:3.

8        Petitioner appears to challenge the trial court's decision not to give the same

9    instruction multiple times. *See* Pet. at 42-43 (arguing that the trial court should have given

10   the instruction every time hearsay statements were offered). However, the Ninth Circuit

11   has expressly held that a trial court need not repeat an instruction over and over. In *United*

12   *States v. King*, the trial court gave a "requested cautionary jury instruction" only at the end

13   of trial, rather than "at the time the evidence was offered." 552 F.2d 833, 846 (9th Cir.

14   1976). In *King*, the defendant-appellant argued that a limiting instruction should have

15   been offered along with the evidence, rather than once trial had concluded. *See id*. at 846-

16   49. The Ninth Circuit "h[e]ld that the failure to give the requested instruction prior to the

17   presentation of evidence perforce was not error. To repeat such instructions several times

18   in the course of trial would compound the fears of confusion . . . ." *Id*. at 849. If it was not

19   erroneous for the *King* trial court to give a limiting instruction once, at the end of trial, then

20   the trial court here did not err in giving a limiting instruction twice, both at the end of trial

21   and at the time the evidence was offered.

22       Third, as Respondent notes, Petitioner's counsel did not request an additional

23   limiting instruction each time hearsay evidence was offered for a limited purpose. *See*

24   Ans. at 21. The Ninth Circuit has repeatedly held that it is counsel's responsibility to

25   request a limiting instruction, and that a trial court does not err by failing to give an

26   instruction sua sponte. *See United States v. Ramirez*, 990 F.2d 1264 (9th Cir. 1993)

27   
Case No. 18-01446 BLF (PR)

28   ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

("Ramirez requested no limiting instruction at trial and the judge is not required to give one *sua sponte.*"); *see also United States v. Palmer*, 691 F.2d 921, 923 (9th Cir. 1982) ("Appellant further asserts that the trial court erred in not giving the jury a limiting instruction regarding the impeachment purposes of the snorting tube. Again, defendant's counsel failed to request such an instruction and the trial court had no affirmative obligation to give one sua sponte. . . . Moreover, a failure to give a sua sponte limiting instruction is generally not reversible error.") (citations omitted); *see also United States v. McLennan*, 563 F.2d 943, 947–48 (9th Cir. 1977) ("The court had said nothing about a limiting instruction because he had not been asked to give one. Nothing prevented counsel from making such a request. In the usual case, the court is not required to give such an instruction sua sponte.") (citing cases). Accordingly, the trial court did not err in giving the limiting instruction only twice.

Moreover, to the extent Petitioner argues that, because the limiting instruction was given only once during trial, the jury was misled into thinking only one statement was admitted pursuant to a hearsay exception, this contention is belied by the record. On at least one occasion, Petitioner's counsel withdrew a hearsay objection because the witness was "talking about the state of mind of" the victim. Ans., Ex. B at 892:10-11; cf. *id*. at 680:5-14 (following a hearsay objection, the prosecutor rephrased a question to ask about the victim's feelings). Similarly, on other occasions the trial court overruled counsel's objections to hearsay because the statement was "not being offered for the truth," but was instead "explaining subsequent conduct." *Id*. at 563:25-28; *see also id*. at 1880:23-1881:3 (admitting testimony to explain conduct); 1886:20-1887:10 (same, with the trial court explaining the difference between hearsay and a non-hearsay purpose). Because the jury was told on multiple occasions that some testimony was being admitted for a non-hearsay purpose, and the difference between hearsay and a statement admitted for a non-hearsay

purpose was explained to the jury several times, a reasonable juror would not have assumed that every statement was admitted for the truth of the matter asserted.

Finally, even if Petitioner's arguments were not belied by the record, any error in refusing to give the same instruction multiple times would have been harmless. In the review of a habeas petition, "[t]he only question for us is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire,* 502 U.S. 62, 72 (1991). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Id*. Here, as discussed above and as found by the state appellate court, the evidence against Petitioner was "overwhelming." Accordingly, even if the trial court had erred in not giving a jury instruction every time out-of-court statements were admitted for a non-hearsay purpose, this Court could not conclude that the resulting conviction violated due process. The state appellate court did not apply federal law in a way that was "objectively unreasonable."

For these reasons, Petitioner's sixth claim is DENIED.

### 3.      Cumulative Error Claim

Petitioner argues the cumulative effect of the alleged constitutional errors violated his right to a fair trial. Pet. at 54. In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003). However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011). Similarly, there can be no cumulative error if there has not been more than one error. *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012).

1     Here, there were no constitutional errors and, therefore, nothing can accumulate to

2     the level of a constitutional violation.

3                                    **IV.  CONCLUSION**

4     After a careful review of the record and pertinent law, the Court concludes that the

5     Petition must be **DENIED**.

6     Further, a Certificate of Appealability is **DENIED**.  *See* Rule 11(a) of the Rules

7     Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the

8     denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated

9     that "reasonable jurists would find the district court's assessment of the constitutional

10    claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may

11    not appeal the denial of a Certificate of Appealability in this Court but may seek a

12    certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate

13    Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

14    The Clerk shall terminate any pending motions, enter judgment in favor of

15    Respondent, and close the file.

16    **IT IS SO ORDERED**.

17    Dated:_____April 2, 2020_____

18                                                            BETH LABSON FREEMAN
                                                             United States District Judge

19

20

21

22

23

24

25

26

27    Case No. 18-01446 BLF (PR)

28    ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

                                            40